HAMNER, Adm'r, *vs.* SMITH.

22    433
111   368

1. In the construction of deeds the cardinal rule is, to arrive, if possible, at the true intent and meaning of the grantor, from a fair consideration of the whole instrument, and then to give effect to that intention, if it can be done without violating any rule of law; and if the instrument bears upon its face evidence that it was written by a person unskilled in legal technicalities, a much greater latitude of construction is indulged, than when it is formal and technical, and appears to have been drawn by a skillful draftsman.

2. A deed of gift was in these words, viz: "Know all men by these presents, that I, A. G., for the love and affection I have for my daughter Mary, that I have given her a certain negro girl named Eliza, about ten years old, with all her issue; which said negroes I warrant and defend to the said Mary during her life, and to her heirs afterwards, (especially those who, in the course of Providence, may live the longest with her,) against the lawful claims of any person or persons whatsoever." *Held:*

That the donor's daughter took an absolute estate in the slaves, and not a life estate merely.

3. The case of Ewing v. Standifer, 18 Ala. 400, re-affirmed.

ERROR to the Circuit Court of Wilcox.

Tried before the Hon. EZEKIEL PICKENS.

This was an action of TROVER, brought by the plaintiff in error, as the administrator of Mary Williamson, deceased, to recover for the conversion of five negro slaves; and the court having decided upon a question of law, during the progress of the trial, adversely to the plaintiff, he took a bill of exceptions, which was sealed by the presiding judge, and submitted to a non-suit under the statute, which he now moves to set aside.

It appears from the bill of exceptions, that the plaintiff's intestate had the slaves in her possession before and at her death, and claimed them under a deed in the words following:

"State of North Carolina, ⎰ Know all men by these
       Cumberland County. ⎱ presents, that I, Alexander Graham, sr., for the love and affection I have for my daughter, Mary Gordon, that I have given her a certain negro girl named Eliza, about ten years old, with all her issue; which said negroes I warrant and defend to the said Mary Gordon during her life, and to her heirs afterwards, (especially those

who, in the course of Providence, may live the longest with her,) against the lawful claims of any person or persons whatsoever; as witness my hand and seal, this 17th of February, A. D. 1813."                                    his

  (signed)          " ALEXANDER ⋈ GRAHAM."
                                               mark.

The plaintiff's intestate was shown to be the grantee in the deed, and the defendant was her daughter. It was also proved that the said Mary had several children, some of whom were living, and others had died before her decease, and had left children who were living.

The question in the court below turned upon the construction of the deed above copied. If it vested the entire property to the slave Eliza in Mary, the donor's daughter, then the plaintiff, her administrator, was entitled to recover; but if she became entitled only to a life estate, then her estate, of course, determined upon her death.

His honor, the circuit judge, was of opinion, and so charged the jury, that the effect of the deed was to vest a life estate in Mary Gordon, since Mrs. Williamson, and that her administrator could not, therefore, recover. Many charges were asked by the plaintiff's counsel, construing the instrument as attempting to create an estate tail, a contingent remainder, or as vesting the absolute property in Mrs. Gordon; all which were refused. The plaintiff excepted to these several rulings of the court, and he here assigns them for error.

WATTS, JUDGE & JACKSON, for plaintiff in error:

1. The true construction of the deed shown in the bill of exceptions shows, that in so many words, an absolute estate in the negro is given to Mary Gordon, the plaintiff's intestate. The gift is not limited to the lifetime of the first taker. It is simply the covenant of warranty which extends during the lifetime of the first taker, and her heirs afterwards. The gift of the estate in the negro is altogether different from the covenant of the warranty, and is perfect without it.

2. But if it should be held, that the deed is inartificially drawn, and that the clause under the warranty limits and controls the gift, still, the question arises, whether, according to the rule in Shelly's case, there is not an absolute estate in

the first taker, and not simply a life estate? The rule is, that where the terms, "heirs" or "issue," or "heirs of the body" or "issue of the body," are used, and no other words are used which explain and control these terms, they are words of limitation, and not words of purchase. The words of explanation must, clearly and unequivocally, indicate that these terms are used to designate a class. 4 Kent marginal p. 229, 230; Price v. Price, 5 Ala.; Machen v. Machen, 15 Ala. 373; Lenoir v. Rainey, 15 Ala.; Ewing v. Standifer, 18 Ala. 400; Isbell v. Macklin et al., decided at this term of the court.

3. The words in this deed which, it is said, explain and qualify the word "heirs," viz: "especially those who, in the course of Providence, may live the longest with her," are too indefinite and uncertain to amount to any explanation. The explanation is more uncertain and indefinite than the thing to be explained. These words do not exclude the idea that the whole of the "heirs" are to take. What ones do not take? Can any answer be given? But to give the most favorable construction to these words contended for by the counsel for the defendant in error, still, the persons intended by the term "heirs" would take under this deed both as heirs and purchasers. The rule is well established, that they cannot take both as heirs and purchasers. If, under the terms of the deed or will, they can take as heirs, then they cannot take as purchasers. See Ewing v. Standifer, 18 Ala. *supra.* The decision in this case is supported, to the fullest extent, by the authorities, English and American. Price v. Price, 5 Ala.; 4 Kent (marginal) 226, 227, 228, and the English authorities cited by him.

LAPSLEY & HUNTER and ELMORE, *contra:*

The plaintiff's intestate took only an estate for life under the deed, on the following grounds:

At common law, any one could limit property to another for life, and then to any one who must live within twenty-one years and nine months of the death of the first taker. Shelley's case was simply an application of this rule to a particular deed. That rule is the law of this court, but it is not inconsistent with our position. While the rule itself has been

sustained, it has been kept within its exact limits, both here and in England, and the courts have escaped from it whenever they could, by laying hold of any expression in the deed which showed that the word "heirs," or "issue," was not used in its general technical sense, but applied to persons living within the limited time. Shelley's case, 1 Coke's R. 89; Bell v. Hogan, 1 Stew. 536; Price v. Price, 5 Ala. 578; Woodley v. Findley, 9 Ala. Rep. 716; Darden v. Burns, 6 Ala. Rep. 363; Williams v. Graves, 17 Ala. R. 62; Flinn v. Davis, 18 Ala. R. 132.

The deed is very inartificially drawn, and this is a very strong argument against applying strict technical rules to it. Saunders v. Saunders, 20 Ala. 710.

The explanatory words are put in the form of a warranty, but no one can suppose that a real warranty was intended. The words of explanation show conclusively that the donor was not speaking of the general line of descent, was not using the word "heirs" in its technical sense, but as descriptive of a class of persons who must be living within the lifetime of said Mary; for how could they live with her, unless born before her death?

It is objected, that the words in brackets are too uncertain. We reply, that they are not uncertain as to the matter for which we mainly use them. They are used by the donor simply as a definition of the word "heirs." As to what *particular* persons are meant, there may be some doubt; but there can be no doubt, whatever, as to the *class* of persons, to-wit: a class living in the lifetime of the first taker. But the words are sufficiently certain, even if particular persons were to be designated. We can give the word "especially" two reasonable meanings, either one of which will give certainty to the clause. It may mean "to-wit," or "that is to say," or "to be more particular;" it may mean "preferring," or "giving preference," or "selecting," or "taking out of the class mentioned" those who should live longest with her.

It is also objected, that the limitation is void, because where persons may take as legatees or heirs, they shall take as heirs, and not as legatees; and that where a word may operate either as a word of limitation or of purchase, it shall be held a word of limitation. In this connection, these words are

"*vox, et preterea nihil,*" as will appear from an examination of the cases in our own court. In none of them has any such rule been permitted to enlarge the first taker's life estate into an absolute one, where there were any words in the deed or will to limit the generality of the word "heirs" or "issue." See the cases in 1 Stew. R. 536; 9 Ala. 716; 17 ib. 62; 18 ib. 132.

The case of Ewing v. Standifer, 18 Ala. 400, which is pressed upon the court, simply decides the old doctrine, that where the deed contains no explanatory words, the word "heirs" gives the first taker the whole estate. The words of the opinion are: "There is no other expression in the will, to aid us in construing this clause, and to explain the term "heirs." How, then, can this case be decisive of the present, where explanatory words are clearly used? But there is one view of that case which must cause it to be overruled, whenever the same facts are presented. The expression, "to be *equally* divided among her heirs at her death," seems to have been entirely overlooked. If full effect is given to that expression, it is fatal to the conclusion there attained by the court, for two reasons: 1. The cases of Bell v. Hogan, Williams v. Graves, Flinn v. Davis, and all the others of that class, proceed on the ground, that the limitation is not too remote, when there is any expression or direction which will necessarily produce an absolute vesting of the title within the limited time; and no direction could more decisively have that effect, than an order to divide at the death of the first taker. 2. All the authorities agree, that if the deed or will orders a distribution or division of the property, different from that of the law by heirship, then the words are held words of purchase, and not of limitation; and if such division is not at a period too remote, it will make the provision effectual. A direction to divide "equally" among all the heirs, is different from the law's division. The law gives it equally, only when the heirs all stand in the same relation. Under the will, children and grand-children would take equally, *per capita ;* under the law, they would take unequally, *per stirpes.*

The true construction of the deed is this: If the words in brackets are taken only as a definition of the word "heirs," and are rejected as too uncertain to give the property to any

particular person, then the first taker has a life estate, with remainder to her heirs living at her death; and if the words in brackets are sufficiently certain, not only to fix the class alluded to, but to give the property to those who should actually live the longest with said Mary, then she takes a life estate, and there is a contingent remainder to those who shall live the longest with her; and if there were no such persons then in existence, to go to her heirs living at her death.

CHILTON, C. J.—The question to be decided by us is, whether the deed from Alexander Graham vested in the intestate the absolute property or only a life interest in the slave Eliza, who is the mother of the other slaves in controversy.

The cardinal rule which must govern in all such inquiries is, to arrive, if possible, at the true intent and meaning of the grantor, from a fair consideration of the whole instrument, and then to give effect to such intention, if it can be done without a violation of any rule of law. In arriving at this intention, it is proper to have regard to the character of the written instrument, as to whether it is formal and technical, bearing upon its face evidence of its having been prepared by a skillful draftsman, or is inartificial, affording proof, by the language in which it is couched and the collocation of its sentences, that it was written by a person unskilled in legal technicalities, and probably unacquainted with the meaning and force of many expressions employed in it. In construing the former, it would be proper to subject it to the technical rules of law as most likely to lead to a correct result, while with respect to the latter, a much greater latitude of construction is indulged. Saunders v. Saunders, 20 Ala. Rep. 710.

Conceding, however, that the instrument before us was drawn by a man wholly unacquainted with legal forms, and applying to it the most liberal rules of interpretation, it is impossible, we think, to arrive at the conclusion that the donor designed to give to his daughter a life estate merely. He gives the slave and all her issue to her, not for life, but absolutely, without any qualification as to the duration of her interest contained in the granting words. Had he intended her to take only a life interest, it is quite improbable that the grantor, however artless and ignorant he may have been,

would have omitted the simple words qualifying the grant—
" I give to my daughter for life," or " to have and hold during
her life," &c.   Such language would readily occur to the most
uncultivated mind, capable of comprehending the commonest
forms of expression; and its omission is pretty clear proof,
that it was not intended to make the instrument so operate.
He declares, " I have given her a certain negro girl named
Eliza, about ten years old, with all her issue,"—and no doubt
laboring under the impression, not uncommon among those
ignorant of law, that a title is not perfect unless assured by
what they call " a general warranty deed," he proceeds to in-
sert a warranty : " which said negroes I warrant and defend
to the said Mary Gordon during her life "—that is, he would
protect her title and ownership so long as she should live, and
after her death, when her heirs should come to the succession,
he would in like manner protect their title—" and to her heirs
afterwards, (especially those who in the course of Providence
may live the longest with her) against the lawful claims of
all persons," &c.   He would not only protect the interest
which might, subsequently to his daughter's death, vest in her
heirs, but he would feel under peculiar obligations to see to it
that the interests in the property of those of the heirs who
had lived the longest with her, should be rendered available
to them.

It is insisted, that a warranty in a deed of gift is nugatory.
Grant this; but the donor was unlearned in the law, and con-
sequently may not have known that such was the fact.
Whether he did or not, however, makes no difference; for it
is impossible, by any just rule of construction, to construe the
words of this warranty into a grant to the heirs of Mary
Gordon, thus limiting her to a life estate.   If the design was
to create a life estate, with remainder over, to take effect upon
the death of Mary, to whom is the remainder limited?   The
slave is warranted to her during her life, and to her heirs af-
terwards.   If this creates a remainder, it is in favor of all the
heirs of Mary; but how can this consist with the expression,
" especially those who, in the course of Providence, should
live the longest with her ?"   To give the property to all, and
especially to some of the class, which latter expression im-
plies an exclusion of such of them as did not live the longest

with Mary, is repugnant in itself; whereas, treating it, as it was evidently designed by the donor, as a guaranty on his part to protect and maintain the title to all the heirs, and especially to those who should live longest with the donee, although inoperative as a warranty, yet, to one ignorant of that fact, there is nothing repugnant or absurd about it; and this view harmonizes with the inartificial character of the instrument.

But conceding the words "warrant and defend," as used in this deed, to be equivalent to "grant," or "give," and even then, it is very clear, according to numerous authorities of this and other courts, that an absolute estate vested in the first taker. It is supposed that the word "heirs" is qualified by the expression "especially those who shall live the longest with her," inasmuch as they could not be her heirs while living with her. Hence, say the counsel, the term designates a class, and is but *descriptio personarum.* But the donor does not limit the property to her heirs while she is living, but afterwards—after her death, then to her heirs and especially to those heirs who before her death had lived the longest with her. We cannot see how this expression can convert the term "heirs" into a designation of a particular class, who are to take from the donor, under the deed, and not as heirs of Mary Gordon.

We have listened with much attention to the argument of the learned counsel, in opposition to the authority of the case of Ewing v. Standifer, 18 Ala. Rep. 400; and having examined that decision with much care, we do not hesitate to re-affirm it as the law. As to the words of distribution super-added to the limitation over in that case, and which the counsel supposes entirely escaped the observation of the court, we have only to say, they have overlooked that portion of the opinion; for on page 403, in quoting from Mr. Lewis' treatise on the law of perpetuity, we say, speaking of the terms "issue and heirs of the body:" They are generally and primarily words of limitation, *i. e.* do not carry the legacy to the person answering that description, but describe and regulate the quantum of interest to be taken by such ancestor; and this construction is not varied by the circumstance of words of division or distribution being superadded to the gift to the issue; nor will that of a gift over in default of issue afford a

sufficient reason for construing the word "issue," otherwise than a word of limitation;" and we say further in that case, that the will providing for a distribution equally among all the heirs, made the same disposition of the property which the law, without it, made. It cannot be contended that our law makes an unequal division of the property among the heirs—for if they stand in equal degree, they take *per capita*, each an equal share; if some of them who would have inherited be dead, leaving children, the latter take *per stripes*—by right of representing their ancestors, and inherit through them.

It is, however, unnecessary now to add to that opinion, since the authorities cited in it, we think, fully sustain the law as there declared. In the case before us, as in the case of Ewing v. Standifer, there is nothing showing that the term "heirs" has any other than its primary meaning. The expression included in parenthesis ("especially those who may, in the course of Providence, live the longest with her,") which, it is insisted, explain and limit the word "heirs" to a particular class, and make it a description of the particular persons to take, is more general and indefinite than the term to be explained. Those heirs who may have lived the longest with her, might have been children, or grand children, or, in default of lineal descendants, her collateral relations. In short, they must fill the character of heirs, and then they do not take to the exclusion of other heirs. But we re-assert the ancient canon of the common law, that when they take in the character of heirs, they must take in the quality of heirs, (Jones v. Morgan, 1 Bro. C. R. 206; 4 Kent's Com. 236, top page, 7th ed.;) and consequently cannot take as purchasers.

But it is said that the rule which is invoked is odious, and that the courts are astute to seize upon very slight circumstances to get round it. For my own part, I think the rule in Shelley's case founded in wise and sound policy. It furnished a solid and stable rule of property, cut off strife and litigation, resulting from the pursuit of loose and conjectural intentions, by giving a fixed and determined meaning to certain expressions; and while it contributed to the free circulation of property, by divesting it of clogs which prevented its alienation, at the same time it afforded ample scope for attention to future provisions to meet family exigencies, which the

interest of society required should not be wholly overlooked. Lewis on Perp. 4; 4 Kent, 227 mar.

We may well admire judicial acumen, when exerted to ascertain what the law is, in order that, when ascertained, whether it be good or bad, it may receive from the judge an implicit obedience ; but I humbly conceive there is no principle more dangerous in the administration of justice, than that which justifies the resort on the part of the judge to slight, flimsy, unsatisfactory shifts to avoid what he conceives to be an odious rule of law. He may meet the justice of the particular case, but the precedent unsettles the law, and tends to make shipwreck of principle. In a word, the judge becomes the arbitrator, rather than the interpreter of the law. "Bouv. Dic. Tit. Judge." I would not be understood as applying these remarks to the judge who tried this cause. They are general, and designed as a response to that class of decisions cited by the learned counsel, which, with becoming humility, I conceive to be obnoxious to such criticism.

After the best examination we are enabled to give this case, we all agree that, in either view of this instrument, it vested in the plaintiff's intestate the absolute property in the slaves. It follows that the judgment in the court below must be reversed, the non-suit set aside, and the cause remanded.